# United States Court of Appeals
## For the First Circuit

No. 22-1056

JOHN DOE,

Plaintiff, Appellant,

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Thompson, Selya, and Gelpí,
Circuit Judges.

Philip A. Byler, with whom Nesenoff & Miltenberg, LLP was on
brief, for appellant.
Joshua Adam Engel and Engel & Martin, LLC on brief for
Education Law Attorneys, amici curiae.
Justin Dillon, KaiserDillon PLLC, and Cynthia P. Garrett on
brief for Families Advocating for Campus Equality, amicus curiae.
Benjamin F. North and Binnall Law Group, PLLC on brief for
Stop Abusive and Violent Environments, amicus curiae.
Scott A. Roberts, with whom Mark Macchi and Hirsch Roberts
Weinstein LLP were on brief, for appellee.
Eugene Volokh and First Amendment Clinic, UCLA School of Law
on brief for Prof. Eugene Volokh, amicus curiae.

August 24, 2022

**SELYA**, **Circuit Judge**.  A writer is free to assume a nom de plume.  That is why Mark Twain and Bob Dylan are better known than Samuel Clemens and Robert Zimmerman.  But, as a rule, litigants in federal court must publicly reveal their true names. In this appeal, we tackle a question of first impression in this circuit:  when is it appropriate for a party to a civil suit in federal court to appear under a pseudonym?  This important question pits the individual's desire for privacy against the public's need to access judicial proceedings.  After determining the appropriate standard for adjudicating motions for leave to proceed under pseudonyms, we vacate the district court's denial of the plaintiff's motion and remand to the district court for application of the discerned standard.

## I

Drawing upon the complaint, we briefly rehearse the facts (largely undisputed for present purposes) and travel of the case.  In 2013 — during his first year of college at Massachusetts Institute of Technology (MIT) — plaintiff-appellant John Doe formed a relationship with a classmate whom we shall call "Jane Roe."  This relationship included episodic sexual intercourse and lasted until the summer of 2014.  But even after the couple broke up, they occasionally had consensual sex during the fall 2014 semester.

On the evening of February 26, 2015, Jane went to John's residence for help repairing her computer and agreed to spend the night in his bed.  The pair fell asleep.  At some point in the early morning hours on February 27, they had sexual intercourse. John says that he observed Jane "fully conscious, alert, and with wide open eyes" and that she provided a variety of nonverbal cues throughout the interaction, thus signaling her effective consent. Afterward, though, Jane asked John what had happened.  John replied that sexual intercourse had taken place.  A few months later, Jane told John that "the sex they had when she was asleep was not okay."

In January of 2016, Jane filed a formal complaint with MIT's Title IX office alleging nonconsensual sexual contact and intercourse occurring on February 27, 2015.  That office launched an investigation, which involved interviewing both John and Jane (as well as other students) and reviewing documents.  On their own initiative, the MIT investigators added a second charge against John for sexual harassment arising from conduct during the 2013-2014 school year (when John and Jane were still in a relationship). In a written report, the investigators found John responsible for both charges.  Following its receipt of the investigators' report, MIT designated a panel of three faculty members drawn from its Committee on Discipline (the Committee) to consider the matter.

On April 25, 2016, the panel held a hearing.  John denied responsibility, but two days later the chair of the Committee

informed John by letter that MIT had found him responsible for nonconsensual sexual contact and intercourse on February 27, 2015 and sexual harassment during the earlier period.  The Committee's letter also informed John that he would be expelled.

John appealed the Committee's findings and sanction.  He argued that, given Jane's nonverbal signals throughout the encounter — which, he said, fit the pattern established in their history of consensual intimacy — he reasonably believed that Jane was awake and had effectively consented to sexual intercourse on February 27, 2015.  He also argued that expulsion was unwarranted because, although he maintained that he reasonably "thought [he] had effective consent" from Jane, he took "responsibility for making a terrible judgement call."  MIT denied the appeal a few weeks later and expelled John just prior to his anticipated graduation.

On December 16, 2021, John — by then married and working as a software engineer in New Jersey — filed suit against MIT in the United States District Court for the District of Massachusetts.  His suit invoked diversity jurisdiction under 28 U.S.C. § 1332.[1]  The complaint alleged breach of contract, promissory estoppel, and denial of basic fairness.  Its gist was that MIT's investigation

---

[1] John alleged that he was a citizen of New Jersey and that (for jurisdictional purposes) MIT was deemed to be a citizen of Massachusetts.  According to the complaint, the amount in controversy exceeded $75,000.

was infected by "[r]adical feminist anti-male bias" to the point of presuming "that the female complainant's story was . . . true" and that John's story was false.  John sought monetary damages, including damages for reputational harm, "past and future economic losses, loss of educational opportunities, and loss of future career prospects."

On the same day that he filed his suit, John filed an ex parte motion to proceed by pseudonym because "requiring him to reveal his identity would result in significant harm to [him], including the exact damages he seeks to remedy in this matter." Five days later, the district court denied the motion in a minute order.  John moved for reconsideration.  On the very next day, the district court denied the motion but stayed the case to facilitate John's anticipated appeal of the denial of his motion to proceed by pseudonym.  This timely appeal followed.

## II

As a threshold matter, we first address our appellate jurisdiction.  Ordinarily — insofar as court cases are concerned — our jurisdiction is limited to "appeals from all final decisions of the district courts of the United States" in this circuit.  28 U.S.C. § 1291.  Giving the phrase "final decisions" a "practical rather than a technical construction," the Supreme Court has permitted immediate appellate review of a "small class" of orders "which finally determine claims of right separable from, and

collateral to, rights asserted in the action." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949).  Such collateral orders are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  Id.

The collateral order doctrine applies when three conditions are satisfied:  the order must "conclusively determine the disputed question"; it must "resolve an important issue completely separate from the merits of the action"; and it must "be effectively unreviewable on appeal from a final judgment." Will v. Hallock, 546 U.S. 345, 349 (2006) (quoting P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993)). Two salient principles gloss these requirements.  For one thing, an issue is "important" in the relevant sense if it is "weightier than the societal interests advanced by the ordinary operation of final judgment principles." Gill v. Gulfstream Park Racing Assoc., Inc., 399 F.3d 391, 399 (1st Cir. 2005) (quoting Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 879 (1994)).  For another thing — with respect to the third condition — "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'"  Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 107 (2009) (quoting Will, 546 U.S. at

352-53).  The focus of the inquiry is not on the facts of the case but, rather, on "the class of claims, taken as a whole."  Id.

Every one of the nine courts of appeals to consider the question has held that an order denying a motion to proceed by pseudonym is immediately appealable under the collateral order doctrine.  See Doe v. Coll. of N.J., 997 F.3d 489, 494 (3d Cir. 2021); United States v. Pilcher, 950 F.3d 39, 41 (2d Cir. 2020) (per curiam); In re Sealed Case, 931 F.3d 92, 95-96 (D.C. Cir. 2019); Doe v. Vill. of Deerfield, 819 F.3d 372, 375-76 (7th Cir. 2016); Plaintiff B v. Francis, 631 F.3d 1310, 1314-15 (11th Cir. 2011); Raiser v. Brigham Young Univ., 127 F. App'x 409, 410 (10th Cir. 2005); Does I thru XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1066-67 (9th Cir. 2000); James v. Jacobson, 6 F.3d 233, 236-38 (4th Cir. 1993); Doe v. Stegall, 653 F.2d 180, 183 (5th Cir. 1981).  Although we have not yet passed upon the question, we have held, in an analogous context, that "[u]nsealing orders usually warrant immediate review under the collateral order doctrine." Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998) (citing FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 407 (1st Cir. 1987)).

Today, we join the consensus of our sister circuits and hold that orders denying motions to proceed by pseudonym are immediately appealable under the collateral order doctrine.  Such orders conclusively determine the pseudonym question, and that

question is quite separate from the merits.  Additionally, such an order typically resolves an issue of considerable importance because litigants wishing to file under fictitious names often allege that disclosure of their identities would inflict grievous harm upon them.  And this concern is hardly a private matter:  the public has a substantial interest in ensuring that those who would seek justice in its courts are not scared off by the specter of destructive exposure.  Cf. Doe v. Megless, 654 F.3d 404, 410 (3d Cir. 2011) (listing, as factor favoring use of pseudonym, whether "other similarly situated litigants [will] be deterred from litigating claims that the public would like to have litigated"); Advanced Textile, 214 F.3d at 1073 ("[P]ermitting plaintiffs to use pseudonyms will serve the public's interest in this lawsuit by enabling it to go forward.").

        That public interest, moreover, would be imperiled by deferring appellate review of a pseudonym denial until after the entry of final judgment, with the litigant compelled to proceed unmasked.  Once the litigant's true name is revealed on the public docket, the toothpaste is out of the tube and the media or other interested onlookers may take notice in a way that cannot be undone by an appellate decision down the road.  See Standard Fin. Mgmt., 830 F.2d at 407.  A party whose pseudonym motion is denied will find cold comfort in the prospect of reversal on appeal months or years after being forced into the glare of the legal spotlight.

Such belated redress will not dispel the "discernible chill," Mohawk, 558 U.S. at 110, felt by those who fear litigating under their own names.  A district court's denial of a pseudonym motion, therefore, would be effectively unreviewable without the help of the collateral order doctrine.

That ends this aspect of the matter.  We hold that an order denying a litigant's motion to proceed by pseudonym is immediately appealable under the collateral order doctrine.  It follows, then, that we have jurisdiction to hear and determine this appeal.

### III

We review a district court's denial of a motion to proceed by pseudonym for abuse of discretion.  See Does 1-3 v. Mills, 39 F.4th 20, 24 (1st Cir. 2022).  Abuse of discretion "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them."  Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).  And "it is never within a trial court's discretion to make a determination that is premised on an incorrect legal standard."  United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997); see Fox v. Vice, 563 U.S. 826, 839 (2011).

**A**

We recently held that there is a "strong presumption against the use of pseudonyms in civil litigation." Does 1-3, 39 F.4th at 25. We acknowledged, though, that other courts of appeals "have found that the use of pseudonyms may be warranted in 'exceptional cases.'" Id. (quoting Megless, 654 F.3d at 408). Because the pseudonym issue in Does 1-3 arose in the context of an emergency application for a stay, we declined to "formulate[] a test for assessing when parties may proceed under pseudonyms." Id. The case at hand squarely presents the question that we avoided in Does 1-3, and we take up the mantle not only with the assistance of briefing and oral argument from the parties but also with the insight of several amici (for whose help we are grateful).

**1**

We begin by clarifying the source of the presumption against the use of pseudonyms in federal civil litigation.[2] The courts of appeals have endorsed this presumption without fully explicating its legal foundation. We think it important to fill this gap.

To begin, the presumption has no footing in the United States Code. No federal statute prohibits litigants from filing

---

[2] This opinion addresses only the use of pseudonyms in federal civil litigation. It does not purport to address the possible use of pseudonyms in criminal cases, which may present a different mix of considerations.

civil actions under fictitious names.  By the same token, such a presumption is not perfectly traceable to any federal constitutional provision or rule.

Withal, the Civil Rules do offer some comfort for this presumption.  They provide that "[t]he title of the complaint must name all the parties," Fed. R. Civ. P. 10(a), and that "[a]n action must be prosecuted in the name of the real party in interest," id. 17(a)(1).  These provisions afford a toehold for the presumption against the use of pseudonyms (as we observed in Does 1-3, 39 F.4th at 25).  But it is less than obvious that a party's "name" in this context means his true name, to the exclusion of a pseudonym.  Cf. Roe v. Borup, 500 F. Supp. 127, 129 (E.D. Wis. 1980) (rejecting "highly mechanical interpretation of the Federal Rules of Civil Procedure" that would preclude using pseudonym).  And if the Civil Rules should be read to mandate that a complaint state the parties' true names, it would be odd that courts have converted this command into a rebuttable presumption.  Cf. United States v. Tsarnaev, 142 S. Ct. 1024, 1036 (2022) (explaining that "supervisory rules" made by federal courts cannot "conflict with or circumvent a Federal Rule" (citing Carlisle v. United States, 517 U.S. 416, 426 (1996))).

More to the point is the right of public access to judicial proceedings and documents.  The courts of appeals have recognized a qualified First Amendment right of public access to

certain documents filed in civil litigation.  See Courthouse News Serv. v. Quinlan, 32 F.4th 15, 20 n.8 (1st Cir. 2022) (collecting cases).  So, too, the Supreme Court has recognized "a common-law right of access to judicial records," with the caveat that such a right "is not absolute."  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597-98 (1978); see Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 70 (1st Cir. 2011); In re Providence J. Co., 293 F.3d 1, 9-10 (1st Cir. 2002).  But we have never held that the right of public access (whether derived from the First Amendment or from the common law) forbids the use of a pseudonym in civil litigation.

It is true, of course, that in Does 1-3 we noted the "tension" between that common law right and the use of pseudonyms.  39 F.4th at 25.  However, that opinion cannot fairly be read as formally grounding the presumption against pseudonymous litigation in the common law right of public access to judicial documents.  Instead, the right of public access to judicial documents is of a piece with, but does not directly produce, the judicial stance against litigants' use of pseudonyms.  See Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est. (Kamehameha Schs. I), 596 F.3d 1036, 1042 (9th Cir. 2010) (describing presumption against pseudonymity as "loosely related to the public's right to open courts").

In our view, federal courts enforce the presumption against party pseudonyms in civil litigation under their inherent

power to "formulate procedural rules not specifically required by
the Constitution or the Congress." Carlisle, 517 U.S. at 426
(quoting United States v. Hasting, 461 U.S. 499, 505 (1983)). This
inherent power applies foursquare to the presumption against
pseudonymity, which is a "polic[y] intrinsic to the litigation
process." Thomas v. Arn, 474 U.S. 140, 147 n.5 (1985) (citation
omitted). Courts have distilled such a presumption from a brew of
custom and principle, including the values underlying the right of
public access to judicial proceedings and documents under the
common law and First Amendment. See Stegall, 653 F.2d at 185
(describing presumption against pseudonyms as "a procedural custom
fraught with constitutional overtones"); In re Sealed Case, 971
F.3d 324, 326 (D.C. Cir. 2020) (discussing "deeply rooted
tradition" against party pseudonymity); see also Amy Coney
Barrett, Procedural Common Law, 94 Va. L. Rev. 813, 823 n.23 (2008)
("[J]udges fashion much federal common law, including procedural
common law, by drawing from norms generally accepted by the legal
community.").

**2**

Judicial hostility to a party's use of a pseudonym
springs from our Nation's tradition of doing justice out in the
open, neither "in a corner nor in any covert manner." Richmond
Newspapers, Inc. v. Virginia, 448 U.S. 555, 567 (1980) (plurality
opinion) (quoting 1677 Concessions and Agreements of West New

Jersey, reprinted in Sources of Our Liberties 188 (Richard L. Perry
ed. 1959)).  In defending that tradition, we have explained that
"[p]ublic access to judicial records and documents allows the
citizenry to 'monitor the functioning of our courts, thereby
insuring quality, honesty and respect for our legal system.'"
Standard Fin. Mgmt., 830 F.2d at 410 (quoting In re Cont'l Ill.
Secs. Litig., 732 F.2d 1302, 1308 (7th Cir. 1984)).  "Identifying
the parties to the proceeding is an important dimension of
publicness." Doe v. Blue Cross & Blue Shield United of Wis., 112
F.3d 869, 872 (7th Cir. 1997).  That is because — to a certain
degree — letting a party hide behind a pseudonym dims the public's
perception of the matter and frustrates its oversight of judicial
performance.

        Lacking knowledge of the parties' names, the public
could learn virtually nothing about a case outside the facts and
arguments in the record.  The record, though, is not the alpha and
omega of public concern.  To take one example of important extra-
record data, the real-world aftermath of a suit will sometimes
bear upon the assessment of whether justice was done.  Another
example is the kind of institutional rot that is scrubbed from the
record:  judicial conflicts of interest, ex parte contacts, and
the like.  Anonymizing the parties lowers the odds that
journalists, activists, or other interested members of the public
would catch wind of such mischief.  See Globe Newspaper Co. v.

Pokaski, 868 F.2d 497, 503-04 (1st Cir. 1989) (acknowledging "the contribution to governance of investigative reporting" regarding such matters).

An even thornier issue involves protecting the appearance of fairness in judicial proceedings. "Litigating behind a curtain creates a shroud of mystery, giving the impression that something secret is going on." In re Boeing 737 MAX Pilots Litig., No. 19-5008, 2020 WL 247404, at *2 (N.D. Ill. Jan. 16, 2020). Secrecy breeds suspicion. Some may believe that a party's name was masked as a means of suppressing inconvenient facts and that the court was either asleep at the wheel or complicit in the cover up. It is no answer to dismiss such beliefs as conspiracy theories because "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954). Distrust is toxic to the judiciary's authority, which "depends in large measure on the public's willingness to respect and follow its decisions." Williams-Yulee v. Fla. Bar, 575 U.S. 433, 445-46 (2015). A judicial system replete with Does and Roes invites cynicism and undermines public confidence in the courts' work.

The short of it is that the strong presumption against the use of pseudonyms in civil litigation rests on a sturdy foundation. With this assurance in hand, we proceed to address the standard for determining when a party may litigate under a pseudonym.

**IV**

In deciding when the use of a pseudonym in civil litigation may be warranted, several of our sister circuits have devised elaborate multi-factor tests.  These various tests pit the movant's quest for anonymity against an array of countervailing interests.  See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 189 (2d Cir. 2008) (collecting cases).  The Second Circuit, for example, has held that "the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant."  Id.

Many of these suggested tests involve non-exhaustive lists of up to ten factors.  See In re Sealed Case, 931 F.3d at 97 (citing cases).  "Some factors are 'specific aspects of a plaintiff's potential privacy interests' or the weight to be given those interests, but others 'go more to the weight of the countervailing interest in open judicial proceedings.'"  Id. (quoting Doe v. Del Rio, 241 F.R.D. 154, 158 (S.D.N.Y. 2006)).

Regrettably, these multi-factor tests do not establish a clear standard.  See, e.g., Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est. (Kamehameha Schs. II), 625 F.3d 1182, 1191 (9th Cir. 2010) (Reinhardt, J., dissenting from the denial of rehearing en banc) (observing that "[f]ive part or seven part or other multi-part tests are often subject to subjective and inconsistent application" and, in some instances, make "appellate review

extremely difficult, and precedent of little value"); Doe v. Pa. Dep't of Corr., No. 19-1584, 2019 WL 5683437, at *2 & n.10 (M.D. Pa. Nov. 1, 2019) (noting judicial opinions involving this subject matter "frequently read as a rote recitation of factors with a conclusion tacked on the end").  That amorphous quality hampers their utility.  One distinguished academic — who appears as an amicus here — has commented that "the factors are often so vague or ambiguous that, by themselves, they provide relatively little guidance."  Eugene Volokh, The Law of Pseudonymous Litigation, 73 Hastings L.J. 1353, 1426 (2022).  Professor Volokh's amicus brief invites us to eschew a multi-factor balancing test in favor of identifying "narrow categorical limitations or exceptions . . ., tailored to unusual categories of cases that sufficiently distinguish themselves from the norm."  In support, he notes (among other things) that the Civil Rules already provide a categorical exception with respect to minors.  See Fed. R. Civ. P. 5.2(a) ("Unless the court orders otherwise, in an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor, . . . a party or nonparty making the filing may include only . . . the minor's initials.").

     We decline to accept this invitation to try our hand at crafting sharp, categorical exceptions to the strong presumption against pseudonymity in civil litigation.  Because the problem is complex and the cases are not all cut from the same cloth, some

effort to balance a gallimaufry of relevant factors is inevitable. But assembling a compendium of relevant factors is a tricky enterprise and — in our judgment — the appropriate test must center on the totality of the circumstances.  See In re Chiquita Brands Int'l Inc., 965 F.3d 1238, 1247 n.5 (11th Cir. 2020); see also In re Sealed Case, 931 F.3d at 97 (explaining that precise list of factors matters less than whether court took proper account of "the factors relevant to the case before it" that "inform the ultimate balancing of the public and private interests at stake"). Because we see little upside in endorsing one multi-factor test or another, and still less in inventing a new one, we think it unnecessary to festoon the easily understood "totality of the circumstances" standard with any multi-factor trappings.  In the last analysis, district courts enjoy broad discretion to identify the relevant circumstances in each case and to strike the appropriate balance between the public and private interests.

Even so, our skepticism about the wisdom of hard-and-fast rules in this domain does not blind us to the need for greater clarity and predictability with respect to pseudonym decisions. Thus, we appreciate that some general guidelines may be helpful to the district courts.

For a start, we are committed to the proposition that courts — in balancing the relevant interests — must not lose sight of the big picture.  Litigation by pseudonym should occur only in

"exceptional cases." Megless, 654 F.3d at 408; see Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992) (per curiam); Stegall, 653 F.2d at 185.  Lawsuits in federal courts frequently invade customary notions of privacy and — in the bargain — threaten parties' reputations.  The allegations are often serious (at least to the parties) and motivated adversaries do not lack for procedural weapons.  Facing the court of public opinion under these conditions is sometimes stressful — but that is the nature of adversarial litigation.  If commonplace lawsuit-induced distress were enough to justify the use of a pseudonym, anonymity would be the order of the day:  Does and Roes would predominate.  We think it follows that a well-calibrated inquiry needs some workable methodology for sorting out the (relatively few) "exceptional cases" in which pseudonymity should be allowed.

       In another area of procedural common law — the doctrines of abstention — the Supreme Court has given form to a broad "exceptional circumstances" standard by delineating a few "general categories" of cases that fill the bill.  Colo. River Water Conserv. Dist. v. United States, 424 U.S. 800, 813-18 (1976); see Barrett, Procedural Common Law, supra, at 824-26 (describing abstention doctrines as "procedural common law").  Taking our cue from this model, we think it useful to sketch four general categories of exceptional cases in which party anonymity ordinarily will be warranted.

- The first paradigm involves a would-be Doe who reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological). See, e.g., Doe v. Ayers, 789 F.3d 944, 945 (9th Cir. 2015) (allowing use of pseudonym premised upon evidence that disclosure of plaintiff-inmate's history of being sexually abused "would create a significant risk of severe harm at the hands of other inmates"); Advanced Textile, 214 F.3d at 1071 (allowing use of pseudonym for plaintiffs who "fear[ed] extraordinary retaliation, such as deportation, arrest, and imprisonment"); Lauren B. v. Baxter Int'l Inc. & Subsidiaries Welfare Benefit Plan for Active Emps., 298 F.R.D. 571, 573 (N.D. Ill. 2014) (allowing anonymity when public disclosure would threaten plaintiff's recovery from longstanding eating disorder); see generally Sealed Plaintiff, 537 F.3d at 190 (listing, as factor favoring anonymity, "whether identification poses a risk of retaliatory physical or mental harm" (quoting James, 6 F.3d at 238)).

- The second paradigm involves cases in which identifying the would-be Doe would harm "innocent

non-parties." Id. (quoting James, 6 F.3d at 238); see Doe v. Trs. of Dartmouth Coll., No. 18-040, 2018 WL 2048385, at *6 (D.N.H. May 2, 2018) (explaining that nonparty "has a stronger case for anonymity" than party); see also Doe v. Eason, No. 98-2454, 1999 WL 33942103, at *3 (N.D. Tex. Aug. 4, 1999) (granting pseudonym status to parents in litigation involving their minor child).

- The third paradigm involves cases in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated. See Megless, 654 F.3d at 410 (emphasizing need to ascertain whether "other similarly situated litigants [will] be deterred from litigating claims that the public would like to have litigated"). Because "courts provide the mechanism for the peaceful resolution of disputes that might otherwise give rise to attempts at self-help," they must be wary of "deter[ring] the legitimate exercise of the right to seek a peaceful redress of grievances through judicial means." Talamini v. Allstate Ins. Co., 470 U.S. 1067, 1070-71 (1985) (Stevens, J., concurring); see BE&K Constr. Co. v. NLRB, 536 U.S. 516, 532 (2002). A

deterrence concern typically arises in cases involving "intimate issues such as sexual activities, reproductive rights, bodily autonomy, medical concerns, or the identity of abused minors." In re Sealed Case, 971 F.3d at 327. Also typical are cases in which a potential party may be implicated in "illegal conduct, thereby risking criminal prosecution," Stegall, 653 F.2d at 185, and those in which "the injury litigated against would be incurred as a result of the disclosure of the [party's] identity," Frank, 951 F.2d at 324.

- The fourth paradigm involves suits that are bound up with a prior proceeding made confidential by law. This concern manifests itself when denying anonymity in the new suit would significantly undermine the interests served by that confidentiality. See, e.g., R.F.M. v. Nielsen, 365 F. Supp. 3d 350, 371 (S.D.N.Y. 2019) (granting pseudonymity to non-minor plaintiffs challenging immigration authorities' denial of "special immigrant juvenile" status due to family court adjudications, in part because "related records from the New York Family Courts are protected by law"); Doe v. Bates, 18-1250, 2018 WL 4539034, at

*1 (S.D. Ill. Sept. 21, 2018) (granting pseudonym status to plaintiff bringing excessive force claim arising from juvenile detention because "revealing his identity would, in effect, unravel the protections afforded to his juvenile record").

These paradigms are rough cuts, and it is possible that a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated.  Cf. Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n.9 (1987) ("The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases.").  There may also be rare cases in which — although they fall within one or more of these paradigms — either the need for openness or the prospect of serious prejudice to other parties from a grant of pseudonymity overwhelms the movant's privacy concerns.

We add a coda.  Civil actions come in a wide variety of shapes and sizes, and we are not so sanguine as to believe that these four paradigms capture the entire universe of cases in which pseudonymity may be appropriate.  We are confident, however, that the paradigms capture the vast majority of affected cases and, as such, we deem them useful tools for inquiring courts.

**V**

We take stock.  A district court adjudicating a motion
to proceed under a pseudonym should balance the interests asserted
by the movant in favor of privacy against the public interest in
transparency, taking all relevant circumstances into account.  In
most cases, the inquiry should focus upon the extent to which the
facts align with one or more of the following paradigms:  whether
the case is one in which the movant reasonably fears that coming
out of the shadows will cause him unusually severe physical or
mental harm; whether the case is one in which compelled disclosure
of the movant's name will likely lead to disclosure of a nonparty's
identity, causing the latter substantial harm; whether the case is
one in which compelled disclosure would likely deter, to an
unacceptable degree, similarly situated individuals from
litigating; or whether the federal suit is bound up with a prior
proceeding subject by law to confidentiality protections and
forcing disclosure of the party's identity would significantly
impinge upon the interests served by keeping the prior proceeding
confidential.  Because these paradigms are framed in generalities,
a court enjoys broad discretion to quantify the need for anonymity
in the case before it.  This broad discretion extends to the

court's ultimate determination as to whether that need outweighs the public's transparency interest.[3]

The party seeking pseudonymity bears the burden of rebutting the strong presumption against it. In most cases, the district court should require a declaration or affidavit either by the moving party or by someone with special knowledge who can speak to the need for anonymity in that case. See, e.g., Ayers, 789 F.3d at 945 (relying on opinion of person familiar with prison system); Doe v. Trs. of Indiana Univ., No. 12-1593, 2013 WL 3353944, at *3 (S.D. Ind. July 3, 2013) (relying on affidavit from plaintiff's psychiatrist).

District courts must be mindful that "the balance between a party's need for anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses." Advanced Textile, 214 F.3d at 1069. Consequently, an order granting pseudonymity should be periodically reevaluated if and when circumstances change. See, e.g., Lawson v. Rubin, No. 17-6404, 2019 WL 5291205, at *2-3 (E.D.N.Y. Oct. 18, 2019) (explaining why pseudonymity was appropriate in pretrial stages of

---

[3] For the sake of completeness, we note that pseudonymity will never be justified when the public disclosure that the party seeks to forestall is already a fact. See, e.g., Kansky v. Coca-Cola Bottling Co. of New England, 492 F.3d 54, 56 n.1 (1st Cir. 2007) (denying motion to proceed by pseudonym when "district court opinion has already been made publicly available (apparently without objection), and all filings with this court have used the appellant's real name").

sexual assault litigation but not during trial); cf. Advanced
Textile, 214 F.3d at 1068 (referring to arguments that "use of
pseudonyms would prejudice the jury" and impair opposing party's
ability to impeach witnesses (citing James, 6 F.3d at 240-41)).

VI

Having established the proper framework for evaluating
a party's motion to proceed by pseudonym, we turn to the decision
below.

A

In the absence of controlling precedent from this court,
the district court borrowed a test under which "a plaintiff must
show both (1) a fear of severe harm, and (2) that the fear of
severe harm is reasonable." Kamehameha Schs. I, 596 F.3d at 1043
(emphasis in original); see Megless, 654 F.3d at 408. Using that
yardstick, the court denied John's request because it found his
alleged harm to be "speculative conjecture." Even allowing John
to proceed pseudonymously for now, the court added, would not
"cure" his fears of "future reputational harm" because "the full
facts of the case will emerge if the litigation proceeds to trial."

Assuming for argument's sake that the district court's
appraisal of John's claim of severe harm as "speculative
conjecture" is supportable — a matter on which we take no view —
that appraisal alone cannot carry the weight of the district
court's denial of pseudonym status. The district court apparently

thought that a party can never proceed by pseudonym without establishing a reasonable fear that he will suffer severe harm. But as our earlier discussion makes clear, that showing is necessary only under the first paradigm; the other paradigms involve somewhat different considerations.

Nor is this a mere exercise in pedagogy. John argued in the district court that disclosing his name could incidentally expose Jane's identity, and he asked that her identity also be protected. Because Jane is not a party to this case, this argument tracks the second paradigm of exceptional cases that we have identified.

John also made arguments sounding in the third paradigm of exceptional cases — a paradigm under which anonymity is necessary to avoid deterring similarly situated litigants. Among other things, he stressed "the highly sensitive nature and privacy issues that could be involved with being identified as a perpetrator of sexual assault" and predicted that "any ultimate success in this matter would be negated by the disclosure of his name."

The district court applied a standard different than that which we enunciate today by treating the perceived lack of severe harm to John himself as the final word. A reasonable fear of severe harm is not "a sine qua non for allowing plaintiffs to

seek Doe status." Kamehameha Schs. II, 625 F.3d at 1192 (Reinhardt, J., dissenting from the denial of rehearing en banc).

The district court's additional reason for denying the motion — that John's identity would perforce be revealed if the case goes to trial — was also misplaced. First, there is no per se rule barring the use of pseudonyms at trial. See Doe v. Neverson, 820 F. App'x 984, 987 (11th Cir. 2020) (per curiam) (holding that district court abused its discretion by denying anonymity on assumption that disclosure at trial was "inevitable"). Second, the case may never go to trial. And even if the case does go to trial and John is compelled to self-identify then, that fact alone does not explain why he should not remain anonymous at earlier stages of the litigation. See id. at 987 & n.1.

## B

One other matter demands our attention. John has argued that pseudonymity is appropriate because the underlying disciplinary proceeding, brought under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, was conducted confidentially, and he has since kept his participation in it on the downlow. This argument implicates the fourth paradigm of exceptional cases.

We agree that the confidentiality of a Title IX disciplinary proceeding may sometimes — but not always — furnish

grounds for finding an exceptional case warranting pseudonymity. Title IX proceedings are extensively regulated by federal law. The United States Department of Education (the Department) has crafted detailed regulations. See 34 C.F.R. pt. 106. In addition, Congress has imposed procedural requirements on specified university disciplinary proceedings relating to sexual assault and domestic violence, mandating that universities receiving federal funds adopt policies guaranteeing "a prompt, fair, and impartial investigation and resolution" and giving certain procedural rights to both "the accuser and the accused." 20 U.S.C. § 1092(f)(8)(B)(iv); see 34 C.F.R. § 668.46(k). In a nutshell, both Congress and the Executive Branch have given careful thought to the proper conduct of Title IX proceedings.

Confidentiality is an important aspect of that vision. By enacting the Family Educational Rights and Privacy Act of 1974 (FERPA), 88 Stat. 571, 20 U.S.C. § 1232g, Congress sought to prevent educational institutions from unilaterally disclosing "sensitive information about students," Owasso Indep. Sch. Dist. No. I-011 v. Falvo, 534 U.S. 426, 428 (2002), subject to certain enumerated exceptions. Under FERPA, a university receiving federal funds generally may not disclose a student's "education records." 20 U.S.C. § 1232g(a)(4)(A), (b)(1). Student disciplinary records typically fall under this protective carapace. See United States v. Mia. Univ., 294 F.3d 797, 812 (6th

Cir. 2002).  So, too, the Department's regulations implementing Title IX require universities to "keep confidential the identity of any individual who has made a report or complaint of sex discrimination, including . . . any individual who has been reported to be the perpetrator of sex discrimination," subject to a few exceptions (such as the FERPA exceptions).  34 C.F.R. § 106.71.[4]

MIT rejoins that the bubble of confidentiality surrounding Title IX disciplinary proceedings is not airtight.  It pointed out at oral argument that both Title IX and FERPA constrain only the educational institutions themselves; nothing in those statutes (or the regulations thereunder) constrains participants in the proceedings from speaking freely about their personal knowledge of either the investigation or the underlying events.  See 20 U.S.C. § 1232g(b)(1); 34 C.F.R. § 106.71.  This argument misses the mark.

To be sure, neither FERPA nor Title IX imposes a gag order on individual participants.  The schools, not the students or witnesses, are regulated.  That narrow regulatory focus may reflect either a desire to preserve the autonomy (and, perhaps,

---

[4] The Department recently proposed moving this provision to 34 C.F.R. § 106.44(j), without substantially altering it.  See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 132 Fed. Reg. 41390, 41453 (July 12, 2022).

First Amendment rights) of the persons involved in the proceedings or a belief that a student's privacy is most profoundly violated when the disclosure originates from the school rather than from a third party. Either way, it would be a mistake to conclude that the confidentiality attending Title IX proceedings is unimportant simply because it is not absolute. It is evident, we think, that federal law aims to keep such proceedings largely under wraps.

Both at oral argument and in a post-argument letter, see Fed. R. App. P. 28(j), MIT contended that plaintiffs such as John automatically forfeit the confidentiality protections of both FERPA and Title IX by bringing suit. Under the FERPA regulations, when a student "initiates legal action against" a school, the school "may disclose to the court, without a court order or subpoena, the student's education records that are relevant for the [school] to defend itself." 34 C.F.R. § 99.31(a)(9)(iii)(B); see id. § 106.71 (providing exception to Title IX confidentiality requirement "as may be permitted by the FERPA statute . . . or FERPA regulations"). Invoking this exception, MIT asserts that FERPA's protections "fall by the wayside as soon as the student sues the institution."

It takes rose-colored glasses to read this regulation so expansively, and we reject such a reading. The provision at issue is addressed to the plight of a school trying "to defend itself" against a student lawsuit with its hands tied by FERPA. The

regulation thus allows the school to submit "relevant" documents "to the court."  34 C.F.R. § 99.31(a)(9)(iii)(B).  That exception does not defenestrate the student's privacy interests simply because he has sued the school.  Rather, the exception — which is absent from the FERPA statute itself — is grounded in "a theory of implied consent."  Family Education Rights and Privacy, 65 Fed. Reg. 41852, 41858 (July 6, 2000).  When a student (or former student) files suit against a school and moves for pseudonymity, any implied consent is necessarily limited — especially when it is uncertain whether the student would continue prosecuting the action if pseudonymity were denied.  And it is significant that the regulation permits disclosure solely "to the court," not to the world at large.  The privacy concerns animating FERPA continue to have force notwithstanding the litigation, but they become subject to the needs of the judicial process.[5]

_____

[5] In its Rule 28(j) letter, MIT submits that "the exception in 34 C.F.R. § 99.31(a)(9)(iii)(B) . . . permits the institution to disclose that student's relevant education records publicly to the court, as opposed to being required to file the same under seal."  Because it is unnecessary for us to reach the issue, we take no view on whether this regulatory exception absolves a school from seeking to file FERPA-protected information under seal.  Cf. MetLife, Inc. v. Fin. Stability Oversight Council, 865 F.3d 661, 673-74 (D.C. Cir. 2017) (explaining, with respect to other statutes and regulations, that agency violated applicable confidentiality provisions by "unilaterally filing the information on the public record").  The relevant question for purposes of the pseudonymity motion is how the court, not MIT, should handle the otherwise-protected information on its docket.

Of course, FERPA and Title IX govern the conduct of schools — not judicial decisions concerning the extent of public access to information on the court's docket.  But courts cannot ignore the background confidentiality regime in assessing the circumstances relevant to a request for pseudonymity.  We find persuasive the D.C. Circuit's reasoning in the analogous context of a motion to unseal documents that a federal agency would otherwise be prohibited from disclosing by statute.  That court explained that "[a]lthough [the statute] does not categorically protect the sealed information, it does represent a congressional judgment about the importance of maintaining the confidentiality of nonpublic information submitted to [the agency]," and therefore the statutory "confidentiality provision should weigh heavily in" the district court's balancing.  MetLife, Inc. v. Fin. Stability Oversight Council, 865 F.3d 661, 675 (D.C. Cir. 2017); see Doe Co. No. 1 v. CFPB, 195 F. Supp. 3d 9, 19-23 (D.D.C. 2016) (applying similar reasoning to pseudonym decision in different statutory context).  The same is true of information made confidential by FERPA and Title IX.

In federal suits that amount to collateral attacks on Title IX proceedings, a full appreciation of the public's interest in transparency must factor in the choice by Congress and the Department to inhibit a school's disclosure of private information, such as the name of an accused student.  After all,

"[i]t makes little sense to lift the veil of pseudonymity that —
for good reason — would otherwise cover these proceedings simply
because the university erred and left the accused with no redress
other than a resort to federal litigation." Doe v. Rector &
Visitors of George Mason Univ., 179 F. Supp. 3d 583, 593 (E.D. Va.
2016) (emphasis in original).  And destroying that confidentiality
may throw a wrench into other Title IX proceedings.  See id.
(observing that compelling disclosure of accused student-
plaintiff's identity "may discourage victims from reporting sexual
misconduct in the first instance"); see also Nondiscrimination on
the Basis of Sex in Education Programs or Activities Receiving
Federal Financial Assistance, 132 Fed. Reg. 41390, 41453 (July 12,
2022) (setting forth Department's "tentative view" that any
unauthorized disclosure of Title IX proceedings "may chill
reporting of sex discrimination or participation in the
[college's] efforts to address sex discrimination").  The public
has an abiding interest in ensuring that the values underpinning
the confidentiality protections imposed by FERPA and Title IX are
not subverted by collateral attacks in federal court.

## C

The bottom line is that the district court's order cannot
endure.  For the reasons indicated above, we must vacate the
district court's order and remand for application of the standard
that we announce today.  See In re Grand Jury Subpoena, 138 F.3d

- 35 -

442, 445-46 (1st Cir. 1998) (explaining that remand is ordinarily appropriate when district court had to "guess at the rule of decision" and "applied the wrong legal standard"). Exercising its informed discretion, paying due heed to the strong presumption against pseudonymity, considering any evidence adduced, and weighing the parties' arguments, the court should evaluate whether this case is exceptional in light of the four paradigms we have identified. With respect to the fourth paradigm, the district court should consider any additional arguments by the parties as to whether the confidentiality requirements of FERPA and Title IX have weight with respect to John's particular situation.[6] If the court determines that FERPA or Title IX continue to protect John's identity as a respondent in the underlying disciplinary proceedings, it should then balance all the relevant circumstances to determine whether compelling John to reveal his name in this case would undermine the federal confidentiality protections to the point of outweighing the public's interest in transparency.

## VII

There is one loose end. As far as we can tell, John Doe's true identity is unknown to both this court and the district

---

[6] We note that the Title IX confidentiality provision in 34 C.F.R. § 106.71 came into effect only after the events giving rise to this case. We take no view as to whether this regulation restricts disclosures about the disciplinary proceeding at issue here.

court.  This state of affairs is problematic because it renders a meaningful recusal check impossible.  See Coe v. Cnty. of Cook, 162 F.3d 491, 498 (7th Cir. 1998); see also 28 U.S.C. § 455 (setting forth bases for judicial recusal, some of them unwaivable).  What is more, if the adjudicating courts never learn the party's identity, giving the judgment preclusive effect in future litigation would be dicey.  It follows that courts tasked with resolving pseudonymity motions must be afforded the anonymous party's true name under seal.

Courts in this circuit should insist upon these best practices when confronted with a motion to proceed by pseudonym. They may do so either formally (by adoption of a local rule or a publicly available operating procedure) or informally (by apprising counsel, on an ad hoc basis, of the need to submit the anonymous party's name, under seal, to the court).

## VIII

We need go no further.  The order of the district court is **vacated** and the case is **remanded** for further proceedings consistent with this opinion.  Costs shall be taxed in favor of the plaintiff.

**Vacated and Remanded**.